You may proceed. May it please the Court. I am David Shilton, representing the Bureau of Land Management. With me at counsel table is Clay Smith for Intervenor State of Idaho. However, he has ceded his time to me on this case. I'm going to try and save about five minutes for rebuttal. This is a citizen suit under the Endangered Species Act, alleging that the Federal Wildlife Agencies, with respect to activities of private irrigators on certain vested rights-of-ways for ditches and canals that go across BLM land in Idaho, I agree with you that they selected certain ones, but there are several thousand of these? There are. They're all over the West, of course. In these two districts that the plaintiffs focused on, the number I've seen, a thousand of these rights-of-way on both Forest Service and BLM lands. I haven't seen an exact breakdown, but it would certainly be in the hundreds in these two districts. And then, of course, across the State of Idaho and the West, there are thousands of them. And so our contention, basically, in this case, is that Section 782 does not apply to the activities of the action. No action authorized, carried out, or funded by the agency, which is the definition in Section 7. But I think it might be helpful, just for a moment, to talk about these rights-of-way and what they are. The bulk of these rights-of-way arise under the Section 9 of the Mining Act of 1866, and that's in the addendum to our brief at page 65. And to paraphrase somewhat, basically, that says that whenever water rights have vested according to local law, they will be protected. And here I quote, the right-of-way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. So it's basically an acknowledgment that these rights had arisen just out of practice under local law. Under the statute, there's no approval process. There's no application process. And the right lasts as long as the water right itself lasts, that is, as long as it's being used for the beneficial purpose for which it arose. Five of the six test cases arose under the 1866 Act. The other one was approved by BLM in 1911 pursuant to the Act of March 3, 1891. That Act permitted an applicant to obtain a right-of-way pursuant to Federal law by filing a MAP, basically, in a statement with the government, the right-of-way vested when the government approved that MAP. Rights under that law also continue in perpetuity. Now, the Federal Land Policy Management Act, or FLIPMA, in 1976 repealed these rights-of-way statutes, but it specifically preserved valid rights-of-way that had arisen under that statute. And in 1986, BLM promulgated regulations to implement FLIPMA, and those regulations affirmed that consistent with the savings clause in FLIPMA, BLM would require existing right-of-way holders to obtain its approval only when they proposed a substantial deviation in either the use or the location of their right-of-way. On that point, if you go to the FLIPMA language, all it really says in the savings clause is that it doesn't do anything to terminate the rights. But how does terminate dovetail with reasonable regulation? Well, it preserves the right, and since the right is basically to continue to convey the water across the land pursuant to State law, BLM doesn't have the authority to say – come in and say, well, now, pursuant to Federal law, we're going to require you to do it differently. So – Well, to do it – what do you mean by to do it differently? As long as they get their water, that's all they have the right to. Is that not right? Well, they have the right to get the water and to convey it in the way that they have traditionally done it. And that's how BLM has read the statute. And I would emphasize that this case is really not a challenge to the position that BLM has taken as to the scope of its authority under FLIPMA. This case is a Section 7 case that says that BLM should have consulted with respect to these rights-of-way. And so to have a consultation duty, you've got to have a Federal action. And our central point is that there is no Federal action. Well, I wanted to understand that. Maybe I should ask the other side. It's a practical matter. If you weren't doing anything, how – what would even trigger the consultation is what I was trying to figure out in the abstract. It's a very good question, and I don't know. What it suggests – what the district court judgment suggests is that every day that BLM folks go into their office, they are taking an agency action that they may have to consult over because they're not going out and enforcing. They're not going out and telling the private irrigators to do something different. So I think this concept that lack of action can trigger Section 7 is a very difficult concept and one that really has no precedent, because I don't know what the – what would trigger it. Here, the district court seemed to say that the 1986 regulations themselves were the relevant agency action. But there are a number of problems with that. First of all – Because one thing that bothered me as I was trying to figure out if these right-of-way holders could, you know, get away with big environmental degradation. But my understanding is that they would still be subject to a Section 9 take action by anybody. Is that correct? That's correct, because Congress in Section 9 has applied the taking prohibition, and taking is very broadly defined to include harms, has defined that to apply to private persons and to states and everybody. So Congress there has a much wider sweep. So the irrigators are subject to Section 9, but in Section 7, Congress took a narrower focus. In Section 7, they wanted to make sure that when federal government agencies take actions, have timber sales, build roads, that they consult and not jeopardize species. Well, let's put a hypothetical – or maybe it's not even hypothetical. Apparently, people think that this particular trout is endangered by having them go up the waterways where the water is taken. And suppose that it's clear that they are being harmed by this, and the agency says, well, we don't have the discretion to ask you to put in a screen or some type of device to control this. Now, maybe the case isn't really right. What if the agency said, look, you've got to put in a screen? Would that be something that your clients could object to? That would be a federal action. That would be an affirmative action that you have to put in a screen. So that would be a different case. Okay. So now what the district court is saying is, in effect, it's action because you're refusing to protect the bull trout when, in fact, you have the authority to protect it. And you have adopted regulations which keep you from taking the proper action, and that is action. That's what he's saying, I think. Well, our answer is twofold. First, the statute just doesn't go that far to apply to even to a refusal to exercise existing discretion. The second part of our answer is we don't believe we have the discretion. But just putting that aside for a moment, this argument did come up in Sierra Club v. Babbitt and the Marbled Muralet case and the Epic v. Simpson Timber case, for all cases from this court, where plaintiffs in those cases argued, well, the government has discretion to enforce Section 9, the take prohibition, and so can't you look at its failure to do that? Its refusal to invoke Section 9 as an action. And the Court said no. So I think this Court has already ruled that inaction is not covered. And I think that makes sense if you look at the specific language of Section 7, which talks about any action authorized, carried out, or funded by the Federal agency. By modifying action with those words, I think Congress is making clear that it's talking about affirmative actions. And, in fact, this Court just recently in the Defenders of Wildlife case said quite specifically that what the Section 7 covers is affirmative actions. With another agency, you represent the BLM. I mean, that's the agency that's at issue here. Right. What could the Fish and Wildlife Service do vis-à-vis these right-of-ways if there were jeopardy or endangered species problems? It has specific authority under Section 9 to enforce against takes. So it could come in under Section 9. Right. Or a private citizen. Or a private citizen. Either one could. And, of course, the agencies can engage in voluntary actions, as BLM and other agencies have done and the State of Idaho has done. There's a screening program with money from BPA to screen ditches and so forth. But there's a prior incantation of which they get to first. And they haven't gotten to these. These are pretty high up on the screen. So if you went in and decided you should put in a screen, then you would be covered under this provision? That would be an affirmative agency action. It would be the agency carrying out an action if it's putting the screen itself or authorizing someone to do it. So, yeah, that would be covered. And the agency would have to take a look and see if it may adversely impact. In fact, in our record, there is a biological assessment for the Mahogany Creek where the BLM did just that. They required the irrigator there to put in a screen and a boss and replace a canal with a pipe. And they did a biological assessment on that. That's covered. If they were going to do that, they would have to consult with Fish and Wildlife? That's right. That's right. Here, though, there is not an action like that. And to ‑‑ Let me ask something else. The BLM has a bunch of land leases out west on all kinds of grazing and other land, right? Would something like a lease have some kind of provision in it that would permit ‑‑ in other words, is that some kind of an affirmative oversight that you have in the situation of a lease that might be different than right away, for example? Sure. I mean, a lease itself, of course, is action, and it's covered. And BLM does consult when it grants grazing leases. I think you may ‑‑ are you asking about after it grants the lease? Correct. What's the situation? This is sort of the continuing authority issue that was raised in the Pacific Rivers case where this court held that where there has been an authorization, as you have in a forest plan, that in certain cases that will be viewed as a continuing authorization, and there may arise a further duty to consult if there's a change like a new species being listed. But that's different from our situation for a couple of reasons. First, the forest plan itself is an authorization which took place after the Endangered Species Act. You don't have that here. Second, the forest plan reserves a lot of authority over what's going to go on afterwards. Every timber sale, every action has to be consistent with that forest plan, and the Forest Service has complete discretion to modify it. Again, that's different here. Since there was no federal agency authorization in the first place, you don't have ‑‑ the agency doesn't have that same kind of continuing discretion. So this is not a continuing authorization sort of situation, and I think the relevant case is, again, Sierra Club v. Navit, where this court considered what we call a pre‑FLIPMA right-of-way. It was a right-of-way for a road in that case, but it was rather similar, except to the extent that BLM in that case actually had a fair amount more authority than it has here. It was basically a right-of-way which allowed a neighboring landowner to build a road across BLM to get to his land on the other side, and it only allowed BLM to object in three specific circumstances, none of which related to listed species. And the court found that that was not subject to Section 7, and basically, you know, made clear that it was because of the agency's lack of authority under these old rights-of-ways statutes. So ‑‑ Counsel, you have just adopted new regulations. Is that right? There have been new regulations, I think, in June of 2005. They're substantially the same as to these issues? They clarify some matters, but they don't stake out any significantly new ground, I don't believe. Isn't that agency action? It is, and the agency, when it promulgated those regulations, they did a biological assessment. So they need to do that for those. And they found, when doing that, that the other problem, there are really two requirements that have to be fulfilled for Section 782 to apply. The first is that there is an affirmative agency action to begin with. The second is ‑‑ Well, I said this was affirmative agency action. Right. Okay. But the second is, does the agency have discretion to take actions that inure to the benefit of the listed species? And so while the agency, in looking at the regulations and their impact, assumed that there was affirmative agency action, it found that it did not have that discretion. So that's the other prong here, which we haven't really had a chance to get to. We don't believe. Did you consult on that? We had public hearings. Well, they found, we haven't really briefed those new regulations. There is a section where they consider the Endangered Species Act implications, but I cannot recall whether they specifically consulted with Fish and Wildlife. I believe they did, but I would have to check, and I can inform the Court on whether they consulted with Fish and Wildlife. That would normally be a matter of public record when they then issued the regulation, and you'd have the commentary in the background. Right. It should be in that regulation. But the district judge ordered that there be consultation within six months. Right. Is it going on? The BLM has obeyed the injunction and has, so they did a biological assessment and they've forwarded that to Fish and Wildlife Service and National Marine Fisheries Service and are basically waiting to hear back. But I don't think, you may be getting to whether there's a mootness question, I don't think there is any mootness question here, because the agency made very clear in doing its biological assessment that it was basically doing it under protest and that it disagreed with the requirement, but obviously you have to comply with an injunction. And so it's not a voluntary compliance sort of situation, plus because of the shortness of time I think it would evade review. I'd like to save the rest of my time for a rebuttal. Thank you. Thank you, and may it please the Court. I'm Laird Lucas for the Plaintiff Appellee's Western Watershed Project Committee for the High Desert. I'd like to start with I thought this case, when I crafted it and brought it, was about the discretion issue over these diversions. We have a problem in central Idaho in the upper Salmon Basin that the BLM takes the position it can't regulate diversions that may go back 100 years. In other public lands, like the Forest Service, they're doing that, and even on private lands they're doing it, they're putting in modern diversion technologies. But on these BLM lands, they're not. And I thought it was because they've taken the legal position, they have no authority to require things like fish screens. When we get into the litigation, then, we've come up against this issue that Mr. Shilton spent so much time on, which is, is there agency action that triggers the ESA under Section 782? I'd like to start with that by looking at the statutory language. The statute says, Federal agencies shall ensure that any action authorized, funded, or carried out by such agency is not likely to jeopardize. So you have two components there. What is the action, and is it authorized, funded, or carried out by the agency? The action here is the annual operation and maintenance of these diversions. Every year, the diverters go onto the public lands and they do things like, in some of the pictures we have in our supplemental excerpts of record, they take gravel and they place tarps in the rivers over rocks to divert the water out. They have to drive on the public lands to do that, they enter on the public lands to do it, they do it every year. They move them around during the year to capture the flow. What's the agency action? The agency action is the authorization. The action is operation and maintenance. It is authorized by the BLM because BLM has adopted these regulations, first in 1986 and recently redone in June of this year, where they authorize that because they say, our legal view is if you started doing this before FLTMA was passed in 1976, you don't need anything from us. That's an incorrect legal view. It disregards the statutory language of FLTMA. It disregards the statutory history of the Rights-of-Way Act. And specifically, what they're saying is after 1976, when FLTMA repealed everything, and that's happening for these test case diversions, they're saying we consider them all to be 1866 acts. But Congress passed the 1901 Act. In 1901, Congress said to get rights-of-way on the public lands, you have to have a permit. The Secretary of Interior shall decide if it's in the public interest, and the Secretary can put conditions to protect the environment. Now, that 1901 Act is the heart of this Court's analysis in the County of Okanagan case, which is a Forest Service case about requiring fish greens and other things to benefit fish. It's also the heart of the Grindstone Butte decision, which is also a Ninth Circuit decision which did apply to BLM rights-of-way. And it says you have to construe 1901 with 1866. Together we harmonize them. What it means is rights-of-way are subject to reasonable regulation after 1901. And almost all the water rights here – excuse me, Your Honor. So you want them to consult with respect to putting screens on? They should consult with respect to the action, which is the annual operation and maintenance of these diversions. The authorization is coming through these regulations. Now, the regulations apply nationwide. Consult with Fish and Wildlife about Fish and Wildlife, I suppose. I'm sorry, Your Honor? You want them to consult with Fish and Wildlife? Yes, they need to do that. They should be consulting about Fish and Wildlife. They need to consult about things like, will we allow the irrigator to go in and continue putting the tarps in, or should they put in a fish green? Fish and Wildlife do it without BLM asking them to. Your Honor, the U.S. Fish and Wildlife Service will not engage in consultation unless it's asked to by the action agency. They take action, Fish and Wildlife. Can they go after these people? They can bring a criminal prosecution against the irrigators for take, and Section 9 is applicable. But what that would require is either I do it, and Your Honor may recall I was in front of you earlier this year, about a similar case where it was a Section 9 case against an individual diverter. You sent us back to go to trial. And those kinds of cases are certainly there, but they require an enormous expenditure of resources. I have to sue a private rancher who has to hire a lawyer. We've got to go through a trial and hire experts and all of that, and it is an inefficient way to solve this problem. But that's what, you know, that's a good argument, but one, if it doesn't meet the statute, is one for Congress to resolve, not us. My question is if you said that there's the you say the action is the annual operation and maintenance under the regulations. It would help me if you could point me to where in the regulations I find that as oversight or duty of BLM. The most recent Federal Register notice that both BLM and Idaho cited in their briefs was the Federal Register from this year. And it's Volume 70 of the Federal Register. I have that. I'm just trying to figure out where. What is the provision of the regulation that you're relying on? Excuse me, Your Honor. It's 43 CFR 2803.2B. And really, when you look at 43 CFR 2801 at SEC, that deals with rights of way. It talks about rights of way getting new ones or renewed ones after FLTMA, and it's in this provision where they say unless you're changing your historical operation, we won't require you to get anything from BLM. That is the authorization, because otherwise, to operate, they need an authorization from BLM. And I think the Court needs to understand that there are no pieces of paper out here that represent the grant of a right of way, except for one. That's the CARIAC diversion. There is a piece of paper there, so there is surely an ongoing authorization for that one. But for the other ones, nobody ever said, was this 1866 Act right or not? Nobody ever looked at it until we brought this litigation. And then they looked at it and they applied these regulations and said, our regulations say that if it was before 1976, we just considered 1866, and we can do nothing about it unless they're going to change it. And it's that doing it the same way we have for 100 years is the problem. They can certainly still get their water. You can put in a pipe to take the water out instead of these gravel push-up dams. This is happening all over the West, and it's funding, being funded through federal agencies and the Bonneville Power Administration, but because of this strange historical gap that we have on BLM, it's not happening there. What I'm having trouble is figuring out, in these other cases, the Sierra Club and Simpson case, at the end of the day, what the Court said is when you've got this wholly private action that threatens the harm, then you move to Section 9. And in the case of Sierra Club, you didn't have an agency action. It just seemed that the language in those cases and the circumstances defined really were quite analogous to the circumstance here. Those are both contract cases where BLM did enter into contracts with private parties. We don't have contracts here. And what Sierra Club said is the BLM's inability to influence the private parties right of way is what sets this case apart from Pacific Rivers. They talk about could BLM have discretionary authority to do something that inures to the benefit of the endangered species. And they said here it doesn't, because the only authority ‑‑ But Pacific Rivers had this whole big document, you know, like a forest plan type document that's ongoing oversight. So we don't have that, and we don't have a contract, somewhere in between. Well, we have a series of rights of way acts that I was trying to emphasize end with the 1901 Act that is Congress's preservation of BLM's authority over these rights of way, and it allows reasonable regulation to require improvements. We have to construe these statutes together. And Mr. Shilton didn't even mention the 1901 Act. Their brief doesn't mention it. Their regulations have written 1901 out of existence. They're acting like there was only an 1866 Act, and those are vested rights that can't be touched. But in fact, 1901 came in, and their regs are ignoring that. That's why their regs are not deserving of deference. They're contrary to law. We're not challenging the entire regs. We're challenging them as applied. This is an as applied case. Those regs authorize this operation of maintenance. Now, I would like to say there's another agency action here which has not received much attention, but Your Honor addressed it, which is grazing permits. The record and even BLM's briefs reflect that these irrigation ditches provide water for stock watering on federal lands. The BLM did do an Endangered Species Act consultation over their grazing permits, but they excluded considering where is the water coming from, how does a diversion of water maybe hurt the fish. They said we're excluding it because we don't have authority to do anything about that. So the grazing leases are out there as direct authorization that is interconnected with these diversions, and the definition of action under the ESA is very broad. The definition of action says, and this is 50 CFR 402.02, action means all activities or programs of any kind authorized, funded, or carried out in whole or in part by federal agencies. And, of course, one of those is regulations, which we've talked about. The grazing permits, which authorize livestock grazing on public lands using water coming from public land streams, they've cut out that part of it. So the grazing permits are another set of action. We briefed this before Judge Windmill. It's in the record and in the briefs. Judge Windmill did not reach it because he stopped at the regulations. He thought that was enough. And I'm not quite sure how to advise the court to go forward, but if you were concerned about the grazing part of it, we could go back and do more before the district court. I feel like the record before you. You're arguing that because they issue, because this wasn't really briefed. It is in our brief. It's mentioned in our brief. I mean, I'm just talking about it based on general knowledge of grazing permits. So they issue a grazing permit over here. Obviously the water has to come from somewhere, either on that parcel or elsewhere. So you're just saying that if they issued an action over there, they by necessity have to consult on everything to do with that? The consultation has to look at all interconnected, interrelated aspects of what's going on. And watering livestock on public lands in places like this where it's arid, if you don't have water, you can't graze the livestock. They don't look, though, where the water's coming from. How is the diversion being operated? Again, we're not saying you can't water the cows. We're saying you can water them in a way that doesn't hurt the fish. You know the old way you've done it, which is put in all this gravel and send it out in open ditches for the cows to water out of. You know that's going to hurt the fish. It's undisputed in this case that these diversions hurt the endangered fish. Everybody agrees with that. The question is how do we solve that problem? And we're not saying they can't use the water, but the Mahogany Creek example that Mr. Shilton used is revealing because there the irrigator had a 1915 water right to take water for miles to his private land, but he stopped doing that in about the 1960s. He started using the ditch just to water his livestock on the public lands. We put attention onto this case, and the BLM required him to use troughs. They didn't look at the diversion in the stream, which blocked passage and dewatered the stream and had no fish stream. They just looked at the troughs. That's the biological opinion you have. They said we can't look at the diversion, we can't look at the stream because it's beyond our jurisdiction for the legal reasons we're here before you today. Let me step back. I'm just thinking about the grazing permits for some reason. Wouldn't your action there to be – wouldn't it be to challenge the issuance of the grazing permit, not – and to the extent that the grazing permit is granted and it may or may not encompass these rights away, and I'm not making any suggestion on that, but wouldn't your remedy to be to challenge those grazing permits and the issuance of grazing permits without consideration of the water sources as opposed to challenging, like we're doing here, the right of way? Your Honor, in our first amendment complaint in the excerpts of record, including page 21, paragraph 69, we specifically identify the grazing permits. Our claim is a ESA section 782 claim that they're jeopardizing these fish by not consulting. And we say they have actions that they need to consult over, include the rights of way, the permits, and a variety of other things. And they're listed in our first amendment complaint. Do you have – is there a timeframe in which you would have to challenge the issuance of a grazing permit? If you're talking about a final agency action being reviewed under the Administrative Procedures Act, there's a whole set of requirements that are going. We're not in an APA case. We're saying this is an ongoing harm to species. It's a citizen supervision under the ESA. It's happening every year. So that's why I don't think there's any statute of limitations here, because the bull trout was listed in 1998. Okay. I have to go back and read the complaint. So you're saying that you challenge the issuance or, well, you challenge the ongoing supervision or oversight of the grazing permits themselves, separate and distinct from your challenge that the BLM, simply by having these rights of ways, is annually operating them. I would not call it separate and distinct, because in my mind I see how they all operate together. They're components of the same problem, which is taking water out of the stream without fish drains and that kind of thing. Right. That water is certainly used under rights of way, but it's also used for irrigation in some instances, but it's also used for livestock grazing. So it has multiple purposes. That's the interrelated, interconnected aspect of the action. I understand it's being interconnected, but it just seems to me that it's important what you're challenging, because it could be that the continuing operations under a grazing permit, of course, would be legally analyzed differently than a standalone right of way. Do you understand my distinction? Yes, I do understand. And I actually, Your Honor, I do believe that the focus of this case is has the BLM taken a wrong legal view of its ongoing discretionary authority to regulate these rights of way? That's why the grazing permits weren't front and center, and Judge Windmill addressed the regulations and that discretionary issue, because really that's what we've all grappled with. Thank you for all your questions. I think I'm done. Thank you very much. Thank you, Your Honor. Just a couple of points. This case is about the count four in the plaintiff's complaint. The other counts have been various dispositions of those, but this injunction arises purely under count four, and that count focuses entirely on the operations of the rights of way. It doesn't focus on grazing leases. This case is not a challenge to grazing leases. This case is not an APA challenge to the regulations. It sounds like the plaintiff's chief concern here is they think BLM is not interpreting its authority broadly enough in its regulations. But that would have to be brought in an APA challenge to either the old regulations if there weren't a statute of limitations problem or the new regulations. Do you think they could bring a separate challenge then to grazing permit oversight? Yes. Yes. But they would have to focus on that, and that would be a different case, because in that case BLM does a biological assessment. It consults. So you'd be looking at the scope of the consultation, whether it was broad enough. That's a very different case. This case is just about the six test case rights of way. That's what the injunction is about. It's about the operation there, which is done by private individuals. So I think the barrier that there was no affirmative Federal action is fatal and requires reversal of that injunction. Let me ask this, counsel. This case, as far as the district court was concerned, was not over. That's right. So are you saying that the district court could proceed on the grazing complaint for that portion? Well, I don't think there's really any grazing complaint in this case. What is, I guess, still left is, because these were test cases, are all of the other similar BLM diversions aside from these six. So that's still left in the case. So this is obviously an appeal from the injunction, and we're saying that the injunction was based on an erroneous premise of law. So I think, you know, you need to focus on that injunction, which was just about the test case diversions. Send it back to the district court to proceed on whatever is left, if there is anything. Whatever is left. We're just asking to reverse with respect to BLM rights of way of this nature, where there's no federal agency action. Thank you. Thank you. Thank both counsel for arguments and also for the briefing. This is a very interesting issue, and it's a complicated one. The case of Western Watersheds v. Macheco is submitted, and we're adjourned for this morning.
judges: B. Fletcher, McKeown, King